1
2
3
4
5                          UNITED STATES DISTRICT COURT
6                              DISTRICT OF NEVADA
7   MICHAEL GARROW,                         Case No. 2:14-cv-02143-RFB-VCF
8              *Petitioner*,
                                            **ORDER**
9   vs.
10
11  BRIAN E. WILLIAMS, *et al.,*
              *Respondents*.
12
13
14          This habeas matter under 28 U.S.C. § 2254 comes before the Court for a decision on
15  the merits on the remaining claims.
16                                      ***Background***
17          Petitioner Michael Garrow challenges his 2011 Nevada state conviction, pursuant to
18  a jury verdict, of one count of conspiracy to commit robbery, one count of burglary while in
19  possession of a firearm, and two counts of robbery with the use of a deadly weapon.
20          The multiple ineffective-assistance claims that remain for decision are best addressed
21  against the backdrop of the evidence presented at trial, which included, *inter alia*, the
22  following.[1]
23          At the relevant time, Legacy Sports Cards ("Legacy") sold new and secondhand sports
24  cards, "hobby boxes" or "wax boxes" containing random assorted sports cards, and sports
25  ─────────────────
26          [1]The Court makes no credibility findings or other factual findings regarding the truth or falsity of
    evidence or statements of fact in the state court. The Court summarizes same solely as background to the
27  issues presented in this case, and it does not summarize all such material. No statement of fact made in
    describing statements, testimony or other evidence in the state court constitutes a finding by this Court. Any
28  absence of mention of a specific piece of evidence or category of evidence in this overview does not signify
    that the Court has overlooked the evidence in considering petitioner's claims.

memorabilia, such as autographed jerseys. Legacy sold these items both at a physical store on South Durango Drive in Las Vegas, Nevada, as well as online, including on eBay. Marcel Bilak owned and operated Legacy. (ECF No. 6-12, at 10-11; Exhibit 12, at 30-36.)

In early 2008, Michael Garrow began buying primarily hobby boxes from Legacy at the store on South Durango. Garrow requested and was permitted to pay for his in-store purchases through the PayPal payment service, which usually was used instead for online purchases. Garrow was a substantial customer, purchasing approximately $9,000.00 in merchandise within a few months. (ECF No. 6-12, at 10-12 & 24; Exhibit 12, at 32-38 & 85.)

In August 2008, Garrow and Legacy owner Marcel Bilak had a dispute involving payment through PayPal, which is referenced in more detail in the discussion of Ground 4(a), *infra*. According to Bilak's testimony, Garrow paid the store only after Bilak retained counsel and threatened to sue Garrow. (ECF No. 6-12, at 12, 24 & 28-29; ECF No. 12, at 38-40, 85-88 & 103-07.)

According to Bilak's testimony, the dispute was particularly acrimonious, even after it was resolved as to the particular payment or payments in question.

Bilak testified to the following final exchange between the two men during a telephone conversation after the matter ostensibly was resolved:

> So before we hung up the phone he said to me, you know, you shouldn't have f**ked with me. If I hear you talk any s**t about me, or you say any s**t about my name, you are going to see what's going to happened [sic] to you. I told him at that point that, you do whatever you have to do, but, please don't come to my place of business anymore. And I hung up the phone.

Bilak reported Garrow's alleged threat to PayPal. (ECF No. 6-12, at 12; Exhibit 12, at 38-40.)

Mark Hansen worked at another Las Vegas sports card store, Ultimate Sports Cards. He had known Michael Garrow since approximately 2003 as a customer of that store and a prior store. According to Mark Hansen's testimony, Michael Garrow came to the store in or around February 2009 and talked to him about "hitting up" – which he took to mean rob – the Legacy store because Garrow was angry with its owner. According to Hansen, the Ultimate Sports Cards owner also was present. Hansen did not take Garrow seriously at the time, but

about a month later Garrow called Mark Hansen to talk about getting Hansen's brother Johnny – who worked at Legacy – to help rob the store. Garrow sought to find out which days Johnny Hansen had off at Legacy. (ECF No. 6-14, at 6-13 & 15-16; Exhibit 14, at 5-12 & 14-15.)

Bilak and Johnny Hansen testified to a March 15, 2009, telephone call that they maintained came from Garrow, which came in while they were in the back office of the store. According to Bilak's testimony, a caller feigning a southern accent asked for Hansen saying that he was Hansen's cousin. Hansen did not have a cousin. After Bilak turned the call over to Hansen, the caller dropped the fake southern accent, not realizing that he was on the speaker phone. Bilak testified that he was "100 percent sure" that the caller's voice was Garrow's voice. Hansen also identified the caller's voice as Garrow's, from prior dealings both at Legacy and another sports card store dating back to 2004. According to their testimony, Garrow said that he was going to "hit" the store; and he sought Hansen's help to do so. When Hansen asked "Is this Michael Garrow?" he said "Don't say my name." Garrow eventually hung up after asking a second time whether he was on the speaker phone. (ECF No. 6-12, at 12-13, 27 & 29; Exhibit 12, at 40-43, 99-100 & 106. ECF No. 6-14, at 35-41 & 65-66; Exhibit 14, at 34-40 & 64-65.)

Bilak testified that, the same day, he received a call from the Ultimate Sports Card owner Jeremy Brown who told Bilak that Garrow had been calling Brown for the past month stating that he was going to rob Bilak's store. Bilak informed the police and asked them to document the report, but he was told that they could not do anything other than to do so and send out an extra patrol. (ECF No. 6-12, at 13-14; Exhibit 12, at 43-45.)

Johnny Hansen testified that, thereafter, Michael Garrow called and texted him multiple times seeking to enlist his aid in a robbery of Legacy. Garrow sought information such as the combination to the safe, confirmation of Hansen's days off at Legacy, and whether there was a surveillance video camera. Hansen told Garrow that there was not a surveillance camera in the store although there in fact was one. Hansen initially did not take Garrow seriously, but he eventually did and stopped answering his phone when Garrow called. (ECF No. 6-14,

at 41-43, 55, 66-67 & 71-72; Exhibit 14, at 40-42, 54, 65-66 & 70-71.)

Shortly prior to the store's 7:00 p.m. closing time on April 15, 2009, three masked men, one armed with a shotgun, entered Legacy and immediately ordered Johnny Hansen and a part-time worker Tom Han to lay face down on the floor. Hansen and Han both did so and thus could not see anything further thereafter. The surveillance video reflected that a fourth, unmasked individual then came in, appeared to point out items to the other three, and himself took a number of items. The robbers additionally took a wallet, phone, and gold chain each from both Hansen and Han. (ECF No. 6-12, at 14-16 & 29-31; Exhibit 12, at 45-55 & 108-13. ECF No. 6-14, at 43-56; Exhibit 14, at 42-55. ECF No. 7-1, at 59-60; Exhibit 15, at 58-59.)[2]

Patrol Officer Keith Celaya took charge of the initial police response and investigation. Officer Celaya reviewed the surveillance video with another officer and at least the store owner, Marcel Bilak. Celaya testified that no identification of any of the suspects was made at that time. (ECF No. 6-14, at 23-24 & 30-31; Exhibit 14, at 22-23 & 29-30.)

Detective Jeffrey Swanbeck thereafter took over the investigation from Officer Celaya. In contrast to Officer Celaya's testimony, Detective Swanbeck testified that he viewed the surveillance video with Marcel Bilak and Johnny Hansen after the robbery and that both men identified Michael Garrow as the fourth, unmasked man in the video. The following day, Detective Swanbeck viewed the video also with Mark Hansen, and he also identified Garrow as the unmasked man. (ECF No. 7-1, at 12-13, 16-17 & 55-56; Exhibit 15, at 11-12, 15-16 & 54-55. See also ECF No. 6-14, at 51-56; Exhibit 14, at 50-55.)

At trial, Marcel Bilak, Johnny Hansen, and Mark Hansen each identified Michael Garrow as the unmasked man in the surveillance video. Detective Swanbeck further stated his view that the unmasked man in the video was Garrow. Defense counsel maintained in closing argument that the video was unclear and that Garrow could not be identified from the recording. The jurors of course could compare for themselves the images in the surveillance

---

[2] Han recalled two masked robbers, but the surveillance video showed three robbers entering the store initially, consistent with Hansen's account. (See also ECF No. 6-14, at 28-29; Exhibit 14, at 27-28.)

video and Garrow as he appeared at trial. (ECF No. 6-12, at 16, 17, 22 & 26-27; Exhibit 12, at 53-54, 57, 80 & 96-99. ECF No. 6-14, at 14, 53-55 & 62-64; Exhibit 14, at 13, 52-54 & 61-63. ECF No. 7-1, at 65; Exhibit 15, at 64. ECF No. 7-3, at 13-14; Exhibit 17, at 42 & 46-48.)

According to the testimony of Marcel Bilak and Johnny Hansen, Legacy did not maintain an inventory *per se* of every sports card in the store. It was daily practice in the trade for private parties to sell large blocks of cards, potentially in the hundreds or thousands, to a store in a circumstance where the store was primarily interested in only a handful of the more valuable cards in the lot. Legacy would list the more valuable cards on eBay and place them out in the display cases in the physical store. If a card was sold in the store, the store then would take the listing off eBay. The eBay listings therefore served as a *de facto* inventory of the more valuable cards in the store, which also would be in the physical display cases until they were sold either in the store or online. (ECF No. 6-12, at 17-18, 24-6 & 28-29; Exhibit 12, at 60-62, 88-96 & 102-05. ECF No. 6-14, at 59-62 & 68; Exhibit 14, at 58-61 & 67.)[3]

Higher value cards often were assigned unique serial numbers. Some cards came with such a serial number originally. Others were assigned a serial number by a grading company when they were submitted for grading. (ECF No. 6-12, at 19-20; Exhibit 12, at 66-69. ECF No. 6-14, at 68-70; Exhibit 14, at 67-69.)

According to the testimony by Marcel Bilak and Johnny Hansen, sports cards from Legacy's stock also carried fairly unique price marking. The store placed its price tags on the back rather than the front of the cards, which was atypical. The store further placed two price tags on a card, one for the book price stated in a trade publication and the other for the store's sale price; and it "would be difficult to find that process anywhere else." One of the store's price guns further was defective in that the last zero after the decimal point was

---

[3]Bilak acceded on cross-examination that there was a "small likelihood" that a card listed on eBay may have been sold at the store. He elaborated on redirect that "once a month, once every month and a half the card will sell in store and, you know, we'll run out to get lunch and by the time we come back it sold on Ebay, that's a rare occurrence," maintaining that "[t]he inventory is correct." (ECF No. 6-12, at 26 & 29; Exhibit 12, at 93 & 105.)

missing. Moreover, on certain cards, Bilak would place a star on the price tag for the store's sales price to alert his employees to not accept a lower price for that particular card. Additionally, the store placed a sticker with a blue dot on the cards that were listed on eBay so that employees would know to remove the eBay listing if the card sold in the store. (ECF No. 6-12, at 18-19 & 27-28; Exhibit 12, at 63-67 & 100-01. ECF No. 6-14, at 66-70; Exhibit 14, at 66-69.)

Following the robbery, Bilak preserved the eBay listings from that date and then removed the listings because the corresponding inventory in the display cases had been stolen. (ECF No. 6-12, at 18 & 26; Exhibit 12, at 62 & 93-94.)

Two days after the robbery, police executed a search warrant at Garrow's Pahrump, Nevada home. Based on the inventory information that they had at the time, the police recovered seven sports cards that Marcel Bilak thereafter identified as having been stolen from Legacy on April 15, 2009, based upon Legacy's eBay listings on that date. The cards were identified by the pricing markings particular to the store, such as the missing zero, and/or a unique serial number. There were thousands of sports cards at Garrow's home. (ECF No. 6-12, at 18-20; Exhibit 12, at 62-70. ECF No. 7-1, at 27-33 & 51-53; Exhibit 15, at 26-32 &50-52.)

According to his trial testimony, Marcel Bilak thereafter saw multiple cards that had been stolen from Legacy being listed well below book value on eBay by "Pahrump Station 2008," which identified "Tonya Zenz" as the lister or seller. The police traced the Internet Protocol (IP) address for the computer from which the "Pahrump Station 2008" eBay listings were made to Michael Garrow. (ECF No. 6-12, at 20-21; Exhibit 12, at 70-76. ECF No. 7-1, at 35-38 & 57-58; Exhibit 15, at 34-37 & 56-57.)

The police executed a second search warrant on Garrow's Pahrump home. When they arrived to execute the warrant, Garrow's laptop was on with the "Pahrump Station 2008" seller's page on eBay up on the screen. Garrow additionally had approximately a dozen mailing envelopes prepared to various addresses around the country with a return address for "T. Zenz." In the second search, with more information, police recovered approximately

1500 cards that had been stolen from Legacy on April 15, 2009, based upon the store's eBay listings that date. The cards again were identified by the price markings particular to the store and/or a unique serial number, such as for a graded Topps 1961 Sandy Koufax card with a unique serial number supplied by the grading company. (ECF No. 6-12, at 21-22; Exhibit 12, at 76-80. ECF No. 7-1, at 37-47, 52-53 & 63; Exhibit 15, at 36-46, 51-52 & 62.)

When Detective SwanBeck questioned Garrow he denied participating in the robbery. He was vague as to where he was on April 15, 2015, however. He said that he went to "some" casinos, to his lawyer's office, and then to his home alone in Pahrump. He in particular provided no specifics as to times that he was at any particular casino that would have allowed detectives to retrieve surveillance video to substantiate or refute his claims. Nor did he state that he instead was with anyone else or at another person's house that day. (ECF No. 7-1, at 18-22 & 134-37; Exhibit 15, at 17-21 & 133-36.)

Approximately six weeks prior to trial, the defense gave notice that Garrow would be calling Camry (spelled Kemery in the notice) Hill as an alibi witness to testify that Garrow was at Hill's residence from approximately 1:00 p.m. to 8:00 p.m. on April 15, 2009. (ECF No. 6-6; Exhibit 6.)

At trial, Michael Garrow testified, *inter alia*, that he picked up Camry Hill at about 8:30 a.m. on April 15, 2009, and then spent the rest of the day with him. According to Garrow's testimony, they went to his lawyer's office, then went looking for military recruiters' offices for Hill, then went to several different casinos, and then finally left to go to Hill's residence around 5:00 p.m. in the late afternoon or early evening. Garrow testified that he left Hill's residence shortly after 8:00 p.m. that evening. Garrow maintained that he did not tell Detective Swanbeck that he was with Hill that day because he did not want to get anyone involved. (ECF No. 7-1, at 85-90, 94-95 & 96-102; Exhibit 15, at 84-89, 93-94 & 95-101.)

Camry Hill testified roughly similarly to the same activities during the day on April 15, 2009, although he varied as to some times during the day, ending up at his house from approximately 3:30 to 4:00 p.m. until 8:00p.m. Hill testified that during the relevant time period, on his two days off, he would "normally either hang out with [Garrow] or stay home"

and further that he and Garrow were "close" and "good friends." Yet he explained his failure to notify the police of his friend's alibi after he was arrested variously because he "didn't want to get involved," he did not "really per se care for the police," and he did not know anything about Garrow's charges. Hill further acknowledged that he declined to talk to the State's investigator after the defense alibi notice. Hill told the investigator at one point that he could talk to Hill's attorney, and gave him an attorney's name, although Hill in fact did not have an attorney. Hill stated at trial that "I said that because I didn't want to misconstrue my words, twist them up, so I decided not to testify then and then testify today." Hill acknowledged that the police therefore were unable to either refute or substantiate their story by going to casinos to review surveillance video. (ECF No. 7-1, at 108-31 ; Exhibit 15, at 107-30.)

Additional factual detail pertinent to individual claims is discussed *infra*.

## Governing Law

When the state courts have adjudicated a claim on the merits, AEDPA imposes a "highly deferential" standard for evaluating the state court ruling that is "difficult to meet" and "which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170 (2011). In particular, "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim – (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Under this highly deferential standard of review, a federal court may not grant habeas relief merely because it might conclude that the state court decision was incorrect. *Pinholster*, 563 U.S. at 202.

Rather, a state court decision is "contrary to" law clearly established by the Supreme Court only if it applies a rule that contradicts the governing law set forth in Supreme Court

case law or if the decision confronts a set of facts that are materially indistinguishable from a Supreme Court decision and nevertheless arrives at a different result.  *E.g., Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003).  A state court decision is not contrary to established federal law merely because it does not cite the Supreme Court's opinions.  *Id.*  Indeed, the Supreme Court has held that a state court need not even be aware of its precedents, so long as neither the reasoning nor the result of its decision contradicts them.  *Id.*  Moreover, "[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous."  540 U.S. at 16.  For, at bottom, a decision that does not conflict with the reasoning or holdings of Supreme Court precedent is not contrary to clearly established federal law.

A state court decision constitutes an "unreasonable application" of clearly established federal law only if it is demonstrated that the state court's application of Supreme Court precedent to the facts of the case was not only incorrect but "objectively unreasonable."  *E.g., Mitchell*, 540 U.S. at 18; *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of Section 2254(d)(2) controls on federal habeas review.  *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004).  This clause requires that the federal courts "must be particularly deferential" to state court factual determinations.  *Id.*  The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous."  393 F.3d at 973.  Rather, AEDPA requires substantially more deference to the state court factual finding:

> . . . . [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence.

-9-

On petitioner's claims of ineffective assistance of counsel, he must satisfy the two-pronged test of *Strickland v. Washington*, 466 U.S. 668 (1984). He must demonstrate that: (1) counsel's performance fell below an objective standard of reasonableness; and (2) counsel's defective performance caused actual prejudice. On the performance prong, the issue is not what counsel might have done differently but rather is whether counsel's decisions were reasonable from his perspective at the time. The reviewing court starts from a strong presumption that counsel's conduct fell within the wide range of reasonable conduct. On the prejudice prong, the petitioner must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *E.g., Beardslee v. Woodford*, 327 F.3d 799, 807-08 (9th Cir. 2003).

"Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). On the performance prong in particular, "[e]ven under a *de novo* review, the standard for judging counsel's representation is a most deferential one." *Harrington v. Richter*, 562 U.S. 86, 105 (2011). Accordingly,

> . . . *Strickland* specifically commands that a court "must indulge [the] strong presumption" that counsel "made all significant decisions in the exercise of reasonable professional judgment." 466 U.S., at 689–690, 104 S.Ct. 2052. The [reviewing court is] required not simply to "give [the] attorneys the benefit of the doubt," . . . but to affirmatively entertain the range of possible "reasons [defense] counsel may have had for proceeding as they did," . . . (Kozinski, C.J., dissenting). *See also Richter, supra*, . . . ("*Strickland* ... calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind").

*Pinholster*, 563 U.S. at 196. *See also Richter*, 562 U.S. at 109-10.

When the deferential review of counsel's representation under *Strickland* is coupled with the deferential standard of review of a state court decision under AEDPA, *Richter* instructs that such review is "doubly" deferential:

> . . . . The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S.Ct. at 1420. . . . . When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Richter*, 562 U.S. at 105.

The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief.  *Pinholster*, 563 U.S. at 569.

### *Discussion*

### *Ground 4(a): Testimony Regarding Prior Business Dispute*

In Ground 4(a), petitioner alleges that he was denied effective assistance of counsel in violation of the Sixth and Fourteenth Amendments when trial counsel opened the door to allow Marcel Bilak to characterize the prior dispute with Garrow as involving fraud, failed to object to any portion of the testimony, failed to object when the State inquired regarding the dispute, and failed to object to any of Bilak's responses.  (ECF No. 1, at 10-11.)

As discussed in the summary of the trial evidence, Bilak and Garrow had a dispute involving payments for purchases by Garrow not going through on Paypal. (See text, *supra*, at 2.)

Prior to trial, the State moved to admit evidence that, *inter alia*, Garrow had attempted to defraud Marcel Bilak's Legacy Sports Cards store.  The State sought to introduce this other acts evidence both to explain why Bilak and Johnny Hansen could readily identify Garrow and further to show Garrow's motive to exact vengeance upon Bilak after having to pay the money in question.  (ECF Nos. 6-4, 6-7, 6-8 & 6-9; Exhibits 4, 7, 8 & 9.)

During a hearing on the first day of trial, the state district court ruled that the State could introduce evidence that there had been prior dealings between Bilak and Garrow, that there had been a dispute, that they exchanged words afterwards, and that Bilak had reported Garrow to PayPal.  The court further ruled, however, that the State could not engage in "a mini-trial" of the PayPal dispute and delve into the specifics of the dispute, including Bilak's allegations of fraud.  (See ECF No. 6-11, at 5-6 & 11-12; Exhibit 11, at 11-13 & 34-37.)

In the opening statements, the State referred to Garrow wanting to get even after a prior business relationship had turned bad and Bilak had told PayPal that he was not happy with Garrow.  The State otherwise did not refer to the details of the prior dispute.  Defense counsel referred more specifically to the business dispute, stating that it was settled amicably

and almost immediately with Bilak receiving full restitution. Counsel thereby sought to call into question the State's assertion that Garrow was angry enough to want to rob the store following a business dispute that was settled almost immediately with full restitution made. (ECF No. 6-12, at 7-10; Exhibit 12, at 19-30.)

On direct examination of Marcel Bilak, the State hewed to the line drawn by the trial court. The State did not delve into the details of the prior dispute with Garrow over and above the narrow points approved by the court. (See ECF No. 6-12, at 12; Exhibit 12, at 38-40.)

On cross-examination, however, defense counsel, as he had done in the defense opening, did inquire into the specifics of the PayPal dispute, seeking to reflect that the prior matter had been resolved. (See ECF No. 6-12, at 24; Exhibit 12, at 87-88.)

Prior to the State's redirect, the trial court ruled during a bench conference that the defense had "opened up the door for the State to go back and explore more." (ECF No. 6-12, at 36, Exhibit 12, at 135-36.)

The State thereafter briefly inquired into the particulars of the dispute from Bilak's perspective, but once again without eliciting any testimony referring to fraud. (ECF No. 6-12, at 28, Exhibit 12, at 103-04.)

On recross, defense counsel again delved into the specifics of the dispute, again seeking to reflect that the matter was resolved, *i.e.,* that Bilak "simply got all the money back that was in dispute." In the course of this inquiry, the following exchange occurred:

> Q    It left some bad feelings on your part, is that fair to say?
>
> A    Sure. He was a good customer. I didn't know why he would try to defraud me.

(ECF No. 6-12, at 29; Exhibit 12, at 106-07.)

On direct appeal, Garrow challenged the admission of the evidence regarding the PayPal dispute and the further admission of particulars regarding the dispute. The Supreme Court of Nevada rejected the claims on the following grounds:

Appellant Michael Garrow contends that the district court erred by admitting evidence of a prior bad act because it was not relevant to the charged crimes or proven by clear and convincing evidence, and its probative value was substantially outweighed by the danger of unfair prejudice. *See Petrocelli v. State*, 101 Nev. 46, 51–52, 692 P.2d 503, 507–08 (1985), *modified on other grounds by Sonner v. State*, 112 Nev. 1328, 1334 & n. 4, 930 P.2d 707, 711–12 & n. 4 (1996). We review the district court's decision to admit evidence of prior bad acts for an abuse of discretion and will not reverse "absent manifest error." *Fields v. State*, 125 Nev. 785, 789, 220 P.3d 709, 712 (2009) (internal quotation marks omitted).

The district court conducted a hearing and determined that evidence of the business dispute between Garrow and the victim was relevant to demonstrate that there was a prior relationship between the two and how the victim was able to identify Garrow. It specifically prohibited the State from introducing the details of the dispute and appears to have concluded that so limited, the probative value of the evidence was not substantially outweighed by its prejudice. And the district court expressly asked defense counsel if he had any objection to the State's characterization of the facts of the dispute; counsel stated he only objected to describing the transaction as fraud. Under these circumstances, we conclude that the district court did not abuse its discretion or manifestly err by admitting evidence of the prior dispute.

To the extent Garrow challenges the fact that the details of the business dispute were elicited during trial despite the district court's ruling after the *Petrocelli* hearing, Garrow is estopped from asserting such a challenge because defense counsel invited any error by opening the door to this testimony during cross-examination. *See Rhyne v. State*, 118 Nev. 1, 9, 38 P.3d 163, 168 (2002).

(ECF No. 8-9, at 3-4; Exhibit 31, at 1-2.)

On state post-conviction review, the state district court limited the evidentiary hearing to an issue unrelated to Ground 4(a). Defense counsel therefore did not appear and testify as to his reasons for his trial decisions. (See ECF No. 9-4, at 41; Exhibit 36, at 40. ECF No. 9-6, at 6; Exhibit 38, at 4, ¶ 12.)

On the corresponding ineffective-assistance claims, the state district court held, *inter alia*, that: (1) counsel did not render deficient performance because "[b]y 'opening the door,' trial counsel was able to strategically argue that Defendant had no motive because Defendant had paid restitution to Mr. Bilak and settled their prior dispute;" and (2) Garrow could not demonstrate prejudice from any alleged deficiency by counsel in this regard because of the

overwhelming evidence of guilt presented at trial, including the multiple witnesses identifying

Garrow as the unmasked man in the surveillance video and the large number of stolen items

recovered from his residence. (ECF No. 9-6, at 7-8; Exhibit 38, at 5-6.)

The Supreme Court of Nevada rejected the corresponding claims presented to that

court on the following grounds:

> Fourth, Garrow claims that trial counsel was ineffective during his cross-examination of the store owner in that counsel opened the door to evidence of prior bad acts, specifically the details surrounding a previous business dispute between him and the store owner. Garrow failed to demonstrate that his counsel was ineffective. This court has stated that "a tactical decision ... is [v]irtually unchallengeable absent extraordinary circumstances."" *Doleman v. State*, 112 Nev. 843, 848, 921 P.2d 278, 280–81 (1996) (*quoting Howard v. State*, 106 Nev. 713, 722, 800 P.2d 175, 180 (1990), *abrogated on other grounds by Harte v. State*, 116 Nev. 1054, 1072 n. 6, 13 P.3d 420, 432 n. 6 (2000)). The district court found that, by opening the door, trial counsel strategically argued that Garrow had no motive to commit the robbery/burglary because he had settled a previous dispute with the store owner quickly and civilly. Additionally, given the substantial evidence of Garrow's guilt, he is unable to demonstrate prejudice from counsel's decision to open the door to the testimony.

> Fifth, Garrow argues that trial counsel was ineffective for failing to object to offensive testimony elicited by the State on redirect examination of the store owner, after trial counsel had opened the door to the testimony. Garrow failed to demonstrate that counsel's performance was deficient or that he was prejudiced. On direct appeal, this court rejected Garrow's argument that the details of the business dispute were inadmissible, concluding that Garrow was estopped from asserting such a challenge after the door to the testimony had been opened. *Garrow v. State*, Docket No. 57665 (Order of Affirmance, February 8, 2012). Therefore, the district court did not err in denying this claim.[FN2]

>> [FN2] We are unconvinced by Garrow's argument that, had counsel objected and preserved the issue for appeal, a different standard of review would have affected the outcome of his direct appeal.

(ECF No. 9-14, at 5-7; Exhibit 46, at 3-5.)

The state supreme court's rejection of the claims in Ground 4(a) was neither contrary

to nor an unreasonable application of clearly established federal law as determined by the

United States Supreme Court.

First, the state supreme court's conclusion that counsel did not render deficient performance in the first instance by opening the door to testimony regarding the details of the PayPal dispute was not an objectively unreasonable application of *Strickland*. As noted previously, review of trial counsel's representation is "doubly deferential" under AEDPA; the reviewing court must affirmatively entertain, under an objective standard, the range of possible reasons counsel may have had for proceeding as he did; and the ultimate question under AEDPA is whether there is any reasonable argument that counsel satisfied *Strickland's* already deferential standard. (See text, *supra*, at 10-11.)

Here, there certainly was a reasonable argument that trial counsel satisfied *Strickland's* deferential performance standard. Prior to trial, counsel had limited the extent to which the PayPal dispute evidence was admissible. However, once in trial, it appears that, with the State's evidence thereby constrained at least for the moment, counsel sought to use selected particulars from the dispute to the advantage of the defense by attempting to show that the dispute had been resolved and did not provide Garrow a motive for robbery. With that approach, counsel took a risk that he might possibly open the door to further evidence of the particulars of the dispute. However, strategic decisions – including such inherent cost-benefit assessments – are "virtually unchallengeable" under *Strickland*. 466 U.S. at 690-91. And counsel's actions further must be judged from his perspective at the time, without "the distorting effects of hindsight." 466 U.S. at 689. The reviewing court therefore cannot infer back from the fact that counsel ultimately was not able to keep the remaining particulars of the PayPal dispute from also being introduced to conclude that counsel's attempt to "thread the needle" in this regard was not a reasonable trial choice.[4]

---

[4]Garrow urges that the state supreme court's analysis of counsel's trial strategy "is wholly speculative and a complete fabrication unsubstantiated by any evidence" because, *inter alia*, counsel did not testify at the state court evidentiary hearing, as to his strategic choices or otherwise. (ECF No. 28, at 20-21.) However, the governing law *requires* the reviewing court "to affirmatively entertain the range of possible 'reasons [defense] counsel may had had for proceeding as they did'" and to inquire "into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Pinholster*, 563 U.S. at 196. The absence of hearing testimony by defense counsel thus did not preclude the Supreme
(continued...)

Once the trial court did rule that the door had been opened and allowed the State further leeway on redirect, defense counsel then inquired further again on recross, ultimately eliciting the fraud response from Bilak to a general question. That was a risk run by further inquiry, but the fact that that risk manifested itself in the single response does not make defense counsel's trial strategy unreasonable. Counsel's performance, again, must be gauged without the distorting effects of hindsight.

The state supreme court's conclusion that trial counsel did not render deficient performance in this respect thus was not an objectively unreasonable application of the general *Strickland* standard on doubly deferential review under AEDPA.

Second, the state supreme court's conclusion that counsel did not render deficient performance also by not objecting to the testimony was not objectively unreasonable under AEDPA. Once the door was opened to the testimony, counsel in truth had no viable basis to object to the testimony, including to Bilak's response regarding fraud to a question that defense counsel asked. The state supreme court's conclusion essentially that such objection would have been futile was not objectively unreasonable, and the *Strickland* standard does not require that defense counsel make futile objections. *See, e.g., Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996)("[F]ailure to take a futile action can never be deficient performance.")[5]

Third, the state supreme court's conclusion that petitioner could not demonstrate resulting prejudice was not an objectively unreasonable application of *Strickland*.

It was not objectively unreasonable for the state court to conclude that, given the

---

[4](...continued)
Court of Nevada from engaging in the analysis that it did; and, indeed, that analysis is compelled by the Supreme Court's governing case law.

[5]The trial court remarked at the time that the prosecutor did not go back into the issue on redirect "the way you could have, based upon what I was saying at the bench." (ECF No. 6-12, at 36; Exhibit 12, at 136.) Based upon trial counsel's perspective at the time – which is the only pertinent perspective under *Strickland* – there was no reasonably potentially viable basis for objecting to the testimony after the district court held that his questions on cross-examination opened the door for further inquiry into the Paypal dispute.

strong trial evidence, there was not a reasonable probability of a different outcome at trial if counsel had not opened the door to the testimony in question. The trial evidence included, *inter alia*, the following: (1) three witnesses testified to Garrow's efforts to enlist the aid of store employee Johnny Hansen in a robbery of the store; (2) three witnesses who knew Garrow well positively identified him as the fourth, unmasked robber in the surveillance video; (3) multiple unique serial-number identified sports cards were listed for sale on eBay from a "Pahrump Station 2008" computer account tied directly to Garrow that instead had been listed for sale by the store on the date of the robbery, approximately eight months after Garrow's last purchase there; (4) when the police executed the second search warrant at his residence, the very same "Pahrump Station 2008" eBay seller's page was up on the screen on Garrow's laptop; and (5) approximately 1500 sports cards, including the multiple unique serial-number identified sports cards, were found in Garrow's residence that instead had been listed for sale by the store on the date of the robbery, again, approximately eight months after Garrow's last purchase there. (See text, *supra*, at 2-8.) There was not a reasonable probability of a different outcome at trial in the face of such evidence if defense counsel instead had not opened the door to further testimony regarding the PayPal dispute, including Marcel Bilak's reference to Garrow trying to defraud him. The state supreme court's conclusion to that effect was not an objectively unreasonable application of *Strickland*.

It further was not an objectively unreasonable application of *Strickland* to conclude that there was not a reasonable probability of a different outcome if counsel instead had objected to testimony regarding the PayPal dispute elicited after the defense opened the door to that further inquiry. Petitioner cannot demonstrate resulting prejudice from a failure to raise a futile objection. Garrow urges that the issue would have been subject to a different standard of review on direct appeal if defense counsel instead had objected to the testimony. However, securing a different standard of review on appeal is not the same as creating a reasonable probability of a different *outcome* on appeal.

Ground 4(a) therefore does not provide a basis for federal habeas relief.[6]

### Ground 4(b)(I): Inventory Expert

In Ground 4(b)(I), petitioner alleges that he was denied effective assistance of counsel because trial counsel failed to retain an expert witness to establish allegedly that there was no way for the store to accurately identify the sports cards stolen in the robbery and/or to distinguish allegedly stolen cards from cards purchased by Garrow previously at the store. (ECF No. 1, at 11.)

As discussed in the background summary, the trial evidence reflected, *inter alia*, that:

---

[6]Petitioner asserts in the reply that the issues set forth in Ground 4(a) also violated his rights to due process and a fair trial. (ECF No. 28, at 15 & n.89.) No such additional federal constitutional claims were presented in Ground 4(a) in the petition. (See ECF No. 1, at 9-11.) Federal habeas pleading is not notice pleading, and constitutional claims must be asserted with specificity. *E.g. Mayle v. Felix*, 545 U.S. 644, 669 (2005). A petitioner thereafter may not raise claims in the reply that were not alleged in the petition. *E.g., Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994). The only claims properly before the Court in Ground 4(a) are claims of ineffective assistance of counsel under the Sixth and Fourteenth Amendments.

Petitioner urges that the state supreme court's holding on direct appeal that the PayPal dispute evidence was properly admitted is not entitled to deference in relation to Ground 4(a). (ECF No. 28, at 16.) The state supreme court's holding on a point of Nevada state evidentiary law instead not only is entitled to deference, it is the end of that matter. Petitioner is in the wrong court to seek to relitigate a state court holding on a state law issue. The Supreme Court of Nevada is the final arbiter of Nevada state law.

Garrow asserts that the state supreme court applied an incorrect standard when it stated that he could not establish prejudice "given the substantial evidence of Garrow's guilt." (See ECF No. 28, at 25, referencing ECF No. 9-14, at 6.) The court clearly referenced the governing authority in *Strickland* and explicitly applied the "reasonable probability of a different outcome" standard on a prior ineffective-assistance claim, after canvassing the extensive evidence of guilt. (See ECF No. 9-14, at 4-5; Exhibit 46, at 2-3.) The court's shorthand reference back to the substantial evidence of guilt when concluding that Garrow could not show prejudice also on this claim in no sense connotes that the court forgot the correct standard that it had explicitly applied only two paragraphs previously. The analysis begins with the presumption that the state courts follow the law, and here it clearly is possible to read the state court decision in a manner that comports with established federal law. *See, e.g., Mann v. Ryan*, 828 F.3d 1143, 1157-58 (9th Cir. 2016)(*en banc*).

Finally, Garrow urges that the state supreme court's conclusion that petitioner could not demonstrate prejudice because of the evidence of guilt against him was objectively unreasonable. He contends that he had a viable alibi, that the evidence that the sports cards found in Garrow's home were stolen from Legacy was based upon an unreliable inventory as argued in Ground 4(b)(I), and that the identification of him as the unmasked man in the surveillance video was unreliable as argued in Ground 4(b)(ii). (ECF No. 28, at 26-27.) The suggestion that the weak and problematic alibi testimony that Garrow and his friend presented at trial undercut the substantial evidence of guilt presented against him is unpersuasive. The testimony is of dubious credibility even on a cold record. (See text, *supra*, at 7-8.) Petitioner's arguments as to the reliability of the inventory and identification evidence similarly are unpersuasive, as discussed further *infra* in connection with the discussion of Grounds 4(b)(I) and 4(b)(ii).

-18-

(1) the Legacy Sports Card Store did not maintain an inventory of every sports card in the store because sports card stores bought large blocks of cards from private parties on a daily basis as to which the store was primarily interested in only the more valuable cards in the block; (2) the more valuable cards were listed on eBay and also placed in the display cases in the physical store; (3) if a card was sold in the physical store rather than online, the store then would take the listing off eBay; (4) the eBay listings therefore served as a *de facto* inventory of the more valuable cards in the physical store; (5) higher value cards often were assigned unique serial numbers, for one reason or another; (6) the store's cards offered for sale also carried fairly unique price markings both from the atypical manner in which the store marked and placed price stickers on the cards as well as the fact that one of its price guns had a defective last zero; (7) the store owner preserved the then-current eBay listings from the time of the robbery corresponding to the items in the display cases in the physical store prior to the robbery; and (8) approximately 1500 sports cards were recovered from Garrow's residence that either matched the unique serial number of a card listed by the store on eBay on the date of the robbery and/or bore the fairly unique pricing sticker indicia attributable to the store for a similarly eBay-listed card as of that date. (See text, *supra*, at 5-7.)

At the state court evidentiary hearing, petitioner presented the testimony of Jeremy Brown, who owned and operated another sports card store in Las Vegas. Brown was a competitor of Marcel Bilak, Legacy's owner; and the two men did not get along at the time of Brown's hearing testimony. (ECF No. 9-4, at 5-6 & 31-32; Exhibit 36, at 4-5 & 30-31.)

Similar to the testimony at trial regarding Legacy, Brown also did not have an inventory system for his store because he had more than a half million cards in his store; and he testified that there was no industry standard for handling online and physical inventory. Similar to the testimony at trial regarding Legacy, Brown's cards that also were listed on eBay had a mark to let the employee know to tell Brown if the card was sold in the physical store. While Brown acknowledged that this left room for human error, he had made only three calls in six years to tell an online customer that a card instead already had been sold in the physical store, albeit Brown listed fewer items online than Legacy did. Similar to the

-19-

testimony at trial, Brown acknowledged that certain higher value cards had unique serial numbers, making those cards one-of-a-kind items. Similar to the testimony at trial, Brown acknowledged that even though he did not have an overall inventory system, he nonetheless could identify the higher value items in his store and knew whether those items had sold yet. Similar to the testimony at trial, Brown further acknowledged that eBay listings provided an informal inventory and that "in my opinion it provides you a good indication that you own that card at one time." (ECF No. 9-4, at 9-12, 15-22, 24, 26 & 36-40; Exhibit 36, at 8-11, 14-21, 23, 25 & 35-39.)

Brown otherwise did not address Legacy's specific procedures as to listing items on eBay and ensuring that cards were removed from eBay if an item was sold in the physical store. Nor did he address the fairly atypical price-marking indicia used by Legacy. As he stated at one point, he could not speak to Legacy's practices. (ECF No. 9-4, at 37; Exhibit 12, at 36.)[7]

The Supreme Court of Nevada rejected the claim presented to that court on the following grounds:

> First, Garrow argues that trial counsel was ineffective for failing to hire an expert witness to dispute ownership of the stolen sports cards as Marcel Bilak, the owner of the store, testified that he did not keep an exhaustive inventory of which sports cards were in his possession. At an evidentiary hearing on this claim, Garrow presented testimony regarding industry standards for tracking inventory of sports cards, and the district court found that the testimony established that the industry standard for cataloguing inventory was that there was no industry standard, that an expert's testimony would not have added to the testimony that was offered at trial by Bilak, and that Garrow failed to demonstrate that his counsel's conduct fell below an objective standard of reasonableness. We conclude that the district court did not err by determining that counsel was not ineffective.

_____

[7]Brown also acknowledged – consistent with the testimony at trial – that he had heard Garrow talking in his store prior to the robbery about robbing Legacy and that either Brown or Mark Hansen called to tell Bilak, although Brown did not take Garrow's talk seriously at the time. (ECF No. 9-4, at 28-30; Exhibit 36, at 27-29.) Calling Brown, in particular, as an inventory expert witness at trial therefore would have presented a mixed bag for the defense. Brown also had had a PayPal payment issue involving Garrow, although he did not know whether that issue was due to intentional conduct by Garrow. (_Id._, at 26-28, 33-35 & 39; Exhibit 36, at 25-27, 32-34 & 38.)

(ECF No. 9-14, at 4; Exhibit 46, at 2.)

The state supreme court's rejection of the claim in Ground 4(b)(I) was neither contrary to nor an unreasonable application of clearly established federal law. A determination that, viewed objectively, trial counsel did not act unreasonably in failing to call an expert witness to testify as Brown testified at the state court evidentiary hearing was not an objectively unreasonable application of the general *Strickland* standard. Brown's testimony did not establish that Legacy's inventory practices departed from an industry standard, did not substantially undercut the State's related trial evidence on any significant point, and instead corroborated the State's evidence on a number of key points.[8] There thus certainly was a reasonable argument that trial counsel's performance satisfied *Strickland's* deferential standard in declining to present such testimony at trial. The state supreme court's rejection of the claim therefore withstands doubly deferential review under AEDPA.

Ground 4(b)(I) accordingly does not provide a basis for federal habeas relief.[9]

---

[8]And, as noted previously, Brown in particular also would have provided inculpatory testimony as to Garrow talking in Brown's store prior to the robbery about robbing Legacy. See note 7, *supra*.

[9]Petitioner maintains in arguing both Grounds 4(a) and 4(b)(i) that "the evidence presented by the State that the cards found in Mr. Garrow's home were the property allegedly stolen from LSC – was pathetic and wholly unreliable, and it is not an exaggeration to say that there is a likelihood that Mr. Garrow is in fact actually innocent of the crime of which he was convicted." (ECF No. 28, at 27 & 31.) This argument misses the mark by a wide margin, as to both claims. If Garrow had been tried for the theft of one or two cards, the prospect that he might have bought the cards at some point prior to August 2008 from Legacy and the store then had failed to take down the eBay listing by the time of the April 15, 2009, robbery might raise, in isolation, at least some doubt as to Garrow's guilt. Garrow instead was tried for the theft of approximately 1500 cards, including one-of-a-kind cards with unique serial numbers and cards with price markings essentially unique to Legacy, which Garrow was seeking to sell online for substantially below book value subsequent to the robbery. (See text, *supra*, at 5-7.) Neither the evidence presented at trial nor the testimony presented at the state court evidentiary hearing presented a reasonable prospect that up to 1500 cards had been sold to Garrow by Legacy prior to August 2008 but had not been removed from the store's eBay listings by the time of the robbery on April 15, 2009. The trial evidence as to ownership of the stolen cards was not inherently unreliable; and petitioner's suggestion of actual innocence is, at best, unpersuasive, particularly when the remaining evidence at trial also is considered. Garrow spoke repeatedly of robbing the store following a dispute with the owner; the store subsequently was robbed; Garrow was identified from the surveillance video as the unmasked robber (as he had been intentionally misinformed by an employee that there was no surveillance camera); and 1500 cards that the store had listed for sale at the time of the robbery were found in petitioner's possession thereafter. That is strong evidence of guilt, not actual innocence.

(continued...)

-21-

---

<sup>9</sup>(...continued)

Petitioner's asserts in the reply that Garrow "spent approximately $9,000-10,000 at LSC between 2008 and 2009." (ECF No. 28, at 32.) Bilak testified, however, that there were no business dealings between the store and Garrow after the PayPal dispute in August 2008. (ECF No. 6-12, at 12; Exhibit 12, at 38-40.)

Petitioner also refers to Bilak's testimony that Garrow purchased almost exclusively "hobby boxes," which contain multiple packs of randomly assorted cards. (ECF No. 28, at 33 & 37.) The approximately 1500 cards recovered during the searches of Garrow's property included one-of-a-kind cards with unique serial numbers that were listed by the store on eBay at the time of the robbery and/or sports cards with Legacy's essentially unique price markings. (See text, *supra*, at 5-7.) Garrow's prior purchase of hobby boxes with random cards does not explain how he came to possess one-of-a-kind cards with unique serial numbers listed on eBay by the store at the time of the robbery. And individual cards obtained from inside hobby boxes, which were sealed up to the point at which they were purchased and opened by the customer, would not have any price markings on them, much less Legacy's essentially unique price markings. (See ECF No. 6-12, at 11-12, 19-20, 23-25 & 29; Exhibit 12, at 35-38, 68-69, 83-85, 89-90 & 105. ECF No. 6-14, at 64-65; Exhibit 14, at 63-64.) Petitioner's reference to hobby box purchases simply is a red herring.

Petitioner further asserts that "Mr. Bilak later testified that this [reliance on eBay listings] methodology was bogus." (ECF No. 28, at 35.) Bilak never so testified. Nothing in either Bilak's trial testimony nor Brown's evidentiary hearing testimony established that any possibility of human error in failing to remove an eBay listing after the sale of an individual card in the physical store provided a viable explanation for Garrow having approximately 1500 cards after the robbery that were listed by Legacy on eBay at the time of the robbery, including one-of-a-kind cards with a unique serial number.

Petitioner's posits that Bilak framed Garrow, lied to the police, and told the police that specific cards that Bilak knew had been sold to Garrow instead had been stolen by Garrow. (ECF No. 36.) Such bare speculative supposition does not carry petitioner's burden of proof on federal habeas review.

Petitioner urges that "[a]n expert could have testified that there was no system for Mr. Bilak to accurately identify the cards taken in the robbery, or to distinguish them from which cards Mr. Garrow had previously purchased from the store." (ECF No. 38.) He further asserts that "the expert who testified at Mr. Garrow's post-conviction evidentiary hearing . . . in fact testified that Mr. Bilak's method of extrapolation of the allegedly stolen property was unreasonable and not credible." (ECF No. 39.) The expert that petitioner presented at the state evidentiary hearing gave no such testimony, in either respect. (See text, *supra*, at 19-20.) The state supreme court's rejection of Ground 4(b)(i) based on the expert testimony *that petitioner actually presented at the state evidentiary hearing* was neither contrary to nor an unreasonable application of *Strickland*. The argumentative characterizations in the federal reply are not evidence.

Petitioner further posits that Brown testified that "Mr. Bilak has a bad reputation in the industry." (ECF No. 39.) The claim in Ground 4(b)(i) in the petition is that trial counsel was ineffective for failing to present expert testimony as to inventory control in sports card stores, not that he failed to present character evidence regarding Marcel Bilak, much less character evidence from a competitor of Bilak's who did not get along with him at the time of his testimony well after trial. (See text, *supra*, at 19.) Petitioner cannot pursue claims in the reply that were not alleged in the petition. *Cacoperdo, supra*. The supposition that Bilak had a bad reputation "in the industry" in any event overstates the vague testimony given, which was not directed specifically to inventory management as opposed to "his reputation as a seller of sports cards in this community." (ECF No. 9-4, at 36; Exhibit 36, at 35.) Petitioner's belated attempt to vaguely attack Bilak's character strays afield from the claim at hand.

(continued...)

### *Ground 4(b)(ii): "Non-Identification" Witnesses and Expert Testimony*

In Ground 4(b)(ii), petitioner alleges that he was denied effective assistance of counsel because trial counsel failed to: (A) "put on witnesses to dispute that the person in the surveillance video was Mr. Garrow;" and (B) "call a memory and identification expert to discuss the suggestive nature of the eyewitness testimony." (ECF No. 1, at 11-12.)

Store owner Marcel Bilak, store employee Johnny Hansen, and his brother Mark Hansen all identified the unmasked man in the surveillance video as Michael Garrow, following upon their prior dealings with him over time as a sports card customer. Detective Swanbeck further stated his view that the unmasked man in the video was Garrow. (See text, *supra*, at 4-5.) In contrast, Mylh Ballaran, Garrow's then girlfriend, with whom he had two children, testified at trial that the unmasked man in the surveillance video did not look like Garrow and was not Garrow. She acknowledged that she told investigating detectives that she "really couldn't tell" whether it was Garrow in the still images culled from the surveillance video. (ECF No. 6-12, at 35; Exhibit 12, at 129-32.)

### *Ground 4(b)(ii)(A) – "Non-identification" Witnesses*

The state supreme court rejected the claim presented to it regarding a failure to present additional "non-identification" witnesses on the following basis:

> Third, Garrow argues that trial counsel was ineffective for failing to call any witnesses to dispute that he was the suspect in the surveillance video after a witness to the crime, the store owner, and a store employee all identified Garrow as the suspect on the video. Garrow failed to demonstrate that counsel's performance was deficient or that he was prejudiced. Garrow made a bare claim that counsel was ineffective for failing to call witnesses but did not provide the names of any witnesses or descriptions of their intended testimony. Bare claims are insufficient to demonstrate that a petitioner is entitled to relief. *Hargrove v. State*, 100 Nev. 498, 502–03, 686 P.2d 222, 225 (1984). Therefore, the district court did not err in denying this claim.

---

[9](...continued)

To the extent that petitioner relies upon exhibits filed with the federal reply that were not before the state courts when they decided the merits of Ground 4(b)(i), any such exhibits that were not in the state court record may not be considered on federal habeas review. *Pinholster,* 563 U.S. at 181-87.

(ECF No. 9-14, at 5; Exhibit 46, at 3.)

The state supreme court's rejection of the bare claim presented to the state courts was neither contrary to nor an unreasonable application of clearly established federal law on the record presented to the state courts.

In the state courts, petitioner did not identify any witnesses that should have been called or reflect their intended testimony. The claim was presented in only six conclusory lines in the counseled state petition speaking to this claim in isolation. (See ECF No. 8-10, at 8-9; Exhibit 32, at 7-8.) The only exhibits attached with the petition were copies of trial transcripts. (See *Id.*, at 12-186.) Petitioner's reply in the state district court similarly stated only conclusorily that "[w]itnesses were available," that counsel failed to put on "any witnesses" to testify on the point, and that the result likely would have been different if counsel had put on "these witnesses." ECF No. 9-2, at 5; Exhibit 34, at 4.) No supporting exhibits were submitted with the reply. (See *id.*) Petitioner's fast track statement on the state post-conviction appeal similarly failed to identify any actual named witness that should have been called or their expected testimony, referring only vaguely to "witnesses," "these witnesses," and "his own witnesses." (ECF No. 9-9, at 19-22; Exhibit 41, at 18-21.) His reply in the state supreme court similarly provided no specifics as to any actual named witness that should have been called. (ECF No. 9-11, at 6-7; Exhibit 43, at 5-6.) Petitioner's petition for rehearing similarly lacked any specifics in regard to this claim. (ECF No. 9-12; Exhibit 44.)

In federal court, petitioner presented for the first time with the federal reply, *inter alia*, a copy of an unsigned letter purportedly by defense investigator John Alamshaw to then trial counsel dated December 8, 2010, prior to Garrow's sentencing. The letter asserts, *inter alia*, that: (a) according to Alamshaw, "[i]t is impossible to make a positive identification of the unmasked suspect from the surveillance video;" (2) according to Alamshaw, "[e]ven after I had photos made and enlarged of the unmasked suspect it is still impossible to make a positive identification;" (3) "Mylah [*i.e.*, the same girlfriend that did testify at trial] and her parents told the police who showed them photos of the unmasked suspect they could not determine if it was Michael Garrow;" (4) Jeremy Brown, the sports card store owner who later

-24-

testified at the state court evidentiary hearing[10] told Alamshaw "that he saw the video and couldn't positively identify Garrow" but "based upon previous conversations he had with Garrow, *that he thought it was him,*" although "he still couldn't positively identify Garrow as the unmasked suspect" from an enlarged frontal face photo. (ECF No. 28-4, at 3; Exhibit D, at ¶¶ 4-7.)(emphasis added.)

When the state courts have adjudicated a claim on the merits, review under AEDPA is limited to the record before the state courts when they adjudicated the claim. *Pinholster*, 563 U.S. at 181-87. The Court therefore cannot consider the material that petitioner presented for the first time with the federal reply. On the bare record presented to the state courts on state post-conviction review, the state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of *Strickland*.

Ground 4(b)(ii)(A) therefore does not provide a basis for federal habeas relief.[11]

---

[10]See text, *supra*, at 19-20.

[11]Over and above the holding in *Pinholster*, a petitioner may not use a reply to an answer to raise additional claims and supporting operative factual allegations that were not included in the federal petition. *Cacoperdo, supra*. Habeas pleading is not notice pleading, and the petitioner instead must state the specific operative factual allegations supporting his claims in the petition. *E.g. Mayle v. Felix*, *supra*. Here, the represented petitioner eschewed filing an amended petition with supporting factual specifics and supporting exhibits, other than a declaration by prior co-counsel for the State. (ECF No. 17, at 2; ECF No. 22.) After respondents answered, petitioner filed a fifty-page-plus reply with extensive factual allegations and exhibits seeking to present facts, claims and arguments that had not been contained in the only four pages of sparse allegations setting forth Grounds 4(a) through 4(c) in the petition. Petitioner cannot essentially "sandbag" respondents in this fashion by alleging factual specifics and seeking to present new evidence for the first time in the federal reply only after respondents have answered. The factual specifics that petitioner seeks to present in the unauthenticated Alamshaw letter thus would not have been properly before the Court even without regard to *Pinholster*.

The Court further notes that: (1) Garrow's then girlfriend, Mylh Ballaran, in fact did testify at trial that she could not identify Garrow from the surveillance video, such that trial counsel did not fail to elicit her testimony in this regard; (2) the girlfriend and her parents were not necessarily unbiased witnesses, given that, among other things, Garrow would not be able to provide child support for her children and their grandchildren while in prison; (3) as noted previously in the discussion of Ground 4(b)(I), Jeremy Brown presented a mixed bag as a potential defense witness, as he also would corroborate prosecution testimony that Garrow was talking about robbing Legacy before the store was robbed; and (4) the defense investigator was neither necessarily impartial nor uniquely qualified to opine as to the feasibility of identifying Garrow from the surveillance video, which, after all, the jury simply could see for themselves. If the foregoing

(continued...)

-25-

### *Ground 4(b)(ii)(B) – Memory and Identification Expert Witness*

The state supreme court rejected the claim presented to it on the following basis:

> Second, Garrow claims that trial counsel was ineffective for failing to hire an identification and memory expert to dispute the suggestive video identification. Garrow failed to demonstrate that counsel's performance fell below an objective standard of reasonableness as Bilak and Johnny Hansen identified Garrow as they viewed surveillance video with a detective immediately after the robbery/burglary. Garrow also failed to demonstrate prejudice. Evidence was presented that Garrow had mentioned he wanted to rob the store, that Garrow's alibi was contradicted, that the owner of the store alerted officers that someone on eBay was attempting to sell the stolen sports cards, and that the IP address for the seller on eBay was traced to Garrow's personal computer at his residence, where officers later recovered hundreds of stolen sports cards. Garrow failed to demonstrate a reasonable probability of a different outcome had counsel hired an identification and memory expert.[FN1] Therefore, the district court did not err by denying this claim.
>
> > [FN1] To the extent that Garrow claims that the district court erred in denying his expert witness fees and failing to conduct an evidentiary hearing, we discern no error.

(ECF No. 9-14, at 4-5; Exhibit 46, at 2-3.)

The state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law on the record presented to the state courts.

At the outset, on this claim as well, petitioner seeks to present evidence with the federal reply that never was tendered to the state courts during state post-conviction review. This newly-presented evidence includes: (1) the Alamshaw letter discussed above under

---

[11](...continued)
specifics constitute all that petitioner had and has to offer, it is highly unlikely that petitioner could demonstrate deficient performance and/or resulting prejudice from counsel failing to call these witnesses at trial, even on a *de novo* review. Review of this claim is not *de novo*, however; and, under *Pinholster*, the Court simply cannot consider this belatedly presented material on deferential review under AEDPA.

The Court will discuss petitioner's remaining subsidiary arguments regarding identification evidence in the discussion of Ground 4(b)(ii)(B) pertaining to expert witness testimony. Petitioner discusses the two claims together. However, while the claims are related, they nonetheless are distinct claims that were rejected on different grounds by the state supreme court. The two claims thus are addressed separately herein on federal habeas review.

-26-

Ground 4(b)(ii)(A) that includes the defense investigator's opinions regarding the surveillance video and statements to him by Mylh Ballaran, her parents, and Jeremy Brown regarding their inability to identify Garrow in the video; (2) photographs of Garrow, including one years after trial from his Facebook page; and (3) testimony by a psychology professor from an unrelated state court case in 2009. (See ECF No. 28, at 43, lines 16-17; 45, lines 8-15; 46, lines 11-23; & 47, lines 1-18.)

As discussed as to the prior ground, when the state courts have adjudicated a claim on the merits, review under AEDPA is limited to the record before the state courts when they adjudicated the claim. *Pinholster*, 563 U.S. at 181-87. This Court therefore cannot consider the material that petitioner presented for the first time with the federal reply. A substantial portion of petitioner's argument regarding Ground 4(b)(ii)(B) accordingly is directed to material that simply cannot be considered on federal habeas review.[12]

Petitioner's remaining arguments in the reply as to this ground are based upon mischaracterization of the state supreme court's holding, misstatement of the content of the trial record, assertions taken out of context from police reports or voluntary statements rather than trial testimony, and/or unsupported speculation or supposition.

Petitioner asserts that "the Nevada Supreme Court's *only stated basis* to deny this claim was that the evidence was so strong that the [sic] against him would not have resulted in a different result at trial." (ECF No. 28, at 41.)(Emphasis in original.) That is not correct. The state supreme court instead stated also that "Garrow failed to demonstrate that counsel's performance fell below an objective standard of reasonableness as Bilak and Johnny Hansen identified Garrow as they viewed surveillance video with a detective immediately after the robbery/burglary." (ECF No. 9-14, at 4; Exhibit 46, at 2.) That holding is a holding under the performance prong under *Strickland*, not the prejudice prong. Petitioner, who has the burden of both proof and persuasion on federal habeas review, failed to present principled argument

---

[12]Further, as discussed also regarding the prior ground, petitioner may not present operative factual allegations for the first time in the reply. See note 11, *supra*. Petitioner's late-breaking factual presentation thus is not properly before the Court even without regard to *Pinholster*.

addressing this alternative basis for the state supreme court's rejection of the claim in Ground 4(b)(ii)(B).

On the prejudice prong, petitioner urges that the evidence against him was "disturbingly weak" and that the identification testimony further was "completely unreliable." (ECF No. 28, at 41.) However, even putting the identification testimony to the side for the moment, it was not an objectively unreasonable application of *Strickland* for the state supreme court to conclude that petitioner failed to demonstrate a reasonable probability of a different outcome had counsel hired an identification and memory expert. The trial evidence included, *inter alia*, the following: (1) three witnesses testified to Garrow's efforts to enlist the aid of store employee Johnny Hansen in a robbery of the store; (2) multiple unique serial-number identified sports cards were listed for sale on eBay from a "Pahrump Station 2008" computer account tied directly to Garrow that instead had been listed for sale by the store on the date of the robbery, approximately eight months after Garrow's last purchase there; (3) when the police executed the second search warrant at his residence, the very same "Pahrump Station 2008" eBay seller's page was up on the screen on Garrow's laptop; and (4) approximately 1500 sports cards, including the multiple unique serial-number identified sports cards, were found in Garrow's residence that instead had been listed for sale by the store on the date of the robbery, again, approximately eight months after Garrow's last purchase there. Moreover, petitioner's trial alibi evidence contradicted what he told officers initially and was of dubious credibility even on a cold record. (See text, *supra*, at 2-8.)[13] There was not a reasonable probability of a different outcome at trial in the face of such evidence if defense counsel instead had hired an identification and memory expert to challenge the testimony by multiple witnesses also identifying Garrow as the unmasked robber in the surveillance video. The state supreme court's conclusion in that regard was not

---

[13] The Court further refers to its discussion of Ground 4(b)(i) regarding the inventory and ownership evidence. (See text, *supra*, at 18-21 & n.9.) While petitioner attempts to challenge the supporting categories of evidence separately as well as in combination, his attack on each category of evidence is belied rather than supported by the record in each instance.

an objectively unreasonable application of *Strickland*. Petitioner maintains that the identification testimony was the only evidence placing Garrow "at the scene," but it was not the only evidence tying Garrow to the crime.

Nor was the identification testimony itself "completely unreliable" as petitioner suggests.

Petitioner places substantial reliance upon the testimony of an officer who he refers to variously as "Detective" Celaya, who testified that he viewed the surveillance video on the evening of the robbery with storeowner Marcel Bilak and no identification of any of the robbers was made at that time. Petitioner posits that "Detective" Celaya's testimony that no identification was made at that time "conflicts with" and "brings into question" testimony by Detective Swanbeck that he viewed the video with Bilak and Johnny Hansen on the evening of the robbery and they identified Garrow from the video. He urges that, based on Celaya's testimony, "there is a strong inference that the witnesses collaborated on and/or modified their testimony about the identifications from one day to the next," positing that no identifications were made until instead the next day, following such collaboration. He contends that also considering Bilak's "axe to grind" against Garrow, Bilak's alleged "willingness to lie to police," and the failure to sequester the witnesses when they identified Garrow from the video, the identification was "farcical and a grotesque miscarriage of justice." (ECF No. 28, at 42-45.)

What the trial record actually reflects is that "Detective" Celaya instead was *patrol officer* Celaya, who had a total of two years experience at the time of the trial, including his time in the police academy. Officer Celaya indeed was the officer who took charge of the initial police response and investigation before the investigating detective arrived. He did testify that he initially reviewed the surveillance video with another officer while the store owner was present and no identification was made at that time. (ECF No. 6-14, at 19-20, 23-24 & 30-31; Exhibit 14, at 18-19, 22-23 & 29-30.)

The actual investigating robbery detective, Detective Swanbeck, testified that, after he arrived, *that same evening*, he viewed the surveillance video with both Marcel Bilak and

Johnny Hansen and both men – *that evening* – identified Michael Garrow as the fourth, unmasked man in the video. (ECF No. 7-1, at 12-13 & 55-56; Exhibit 15, at 11-12 & 54-55.) Detective Swanbeck further testified that the next day he viewed the video again with Mark Hansen, and he also identified Garrow as the unmasked man. (ECF No. 7-1, at 16-17 & 55-56; Exhibit 15, at 15-17 & 54-55.)

Nothing in Officer Celaya's testimony calls into question Detective Swanbeck's testimony as to what occurred *after* he took charge of the investigation from the patrol officer. Officer Celaya initially took charge of the scene and, *inter alia*, viewed the video with the store owner Bilak present and no identification was made at that time. That testimony does not contradict – much less put the lie to – Detective Swanbeck's testimony that he thereafter reviewed the video at a later point that evening with both Bilak and Johnny Hansen and both men identified Garrow in the video.

Petitioner further makes multiple references in the reply, in regard to this claim and others, to Bilak lying to the police and/or his willingness to lie to the police. These references appear to follow from a July 1, 2009, voluntary statement in which Bilak stated that "[t]o the best of my knowledge I am sure that all the cards recovered from the raid on Michael Garrow's are mine." He asserted subsequently in the statement: "Most all of the cards were stolen from my display cases & the remainder are cards that were pulled out of new sealed hobby boxes which he stole." (ECF No. 28-2, at 2; Exhibit B.) Petitioner urges that this isolated statement establishes that Bilak was identifying cards from hobby boxes to the police as cards stolen from his store despite the fact that Bilak would have no way of knowing what cards were in unopened hobby boxes at the time of the robbery. (ECF No. 28, at 37-38.)

Yet petitioner has not cited to any point in the record where this statement was inquired into during Bilak's testimony at trial. Nor has he established that the statement was part of the record before the state courts on post-conviction review, such that it properly may be considered by this Court under *Pinholster*. Perhaps Bilak simply was referring to the background fact that the robbers took not only cards from his display cases but also hobby boxes containing even further cards. What is clear is that, at trial, Bilak identified stolen

cards by unique serial numbers from cards that were listed by Legacy on eBay at the time of the robbery and/or the essentially unique price-markings applied by the store to its display case product, which, by definition, would not apply to unknown cards in unopened hobby boxes. (See text, *supra*, at 5-7 & 18-21.) Petitioner's inference that the isolated and heretofore never-explored sentence in Bilak's July 1, 2009, voluntary statement establishes that Bilak

lied to and was willing to lie to the police is at best strained, as there is nothing in the actual trial record reflecting that unknown cards from unopened hobby boxes were identified as stolen cards recovered during the two searches of Garrow's residence.

Petitioner's scenario positing that Bilak and the other witnesses collaborated together to identify him in the video and otherwise frame him thus is grounded only in speculation, supposition and mischaracterization of the record. Nothing in that speculation establishes that the witnesses' identifications of Garrow in the video were completely unreliable.

Petitioner additionally urges that the identification testimony was unreliable because: (1) Officer Celaya testified that both store employee witnesses referred to the robbers as Asian; (2) Johnny Hansen "testified" that "the one guy who talked had an accent from the Pacific Islands or Hawaii;" and (3) "Mr. Garrow, who is the only perpetrator allegedly speaking on the surveillance video, is not Asian and has no accent." (ECF No. 28, at 42.)

This argument also is based upon multiple mischaracterizations of the record.

Officer Celaya did testify on cross-examination that the two store employees referred to the suspects as being Asian, but he clarified on redirect that his report stated: "Asians (Pacific Islanders)." (ECF No. 6-14, at 29 & 33.) Johnny Hansen testified at the preliminary hearing, but not the trial, that "only one guy talked, and it was Pacific island or Hawaii or something like that." (ECF No. 6-1, at 4, Exhibit 1, at 11-12.) However, Hansen was referring to one of the three *masked* robbers that initially came into the store and ordered him and Han to get on the ground and keep their faces to the ground. He did not even know that there was a fourth, unmasked robber until he looked at the surveillance video later. (ECF No. 6-1, at 3-4; Exhibit 1, at 5-12.) Marcel Bilak and Detective Swanbeck, who were not present at the

robbery, later hypothesized from the surveillance video that the unmasked robber was directing the other three as to what to take because the unmasked man was pointing to items in the store. (ECF No. 6-12, at 16; Exhibit 12, at 54-55. ECF No. 7-1, at 59-60; Exhibit 15, at 58-59.) But there was no audio on the surveillance video, and Detective Swanbeck acknowledged that he could not see whether the unmasked robber actually was speaking rather than just pointing. (ECF No. 7-1, at 59-60; Exhibit 15, at 58-59.) Neither Johnny Hansen nor Tom Han testified to hearing any such verbal directions by an unmasked robber that they were not even aware of at the time because their noses were to the ground as verbally directed by the initial batch of three masked robbers.

This claim accordingly is based upon a misrepresentation of the record. Johnny Hansen was referring to the accent of one of the three *masked* robbers who told him to get on the ground, not of an unmasked robber who later entered the store and of whom he was not even aware either during the robbery or when he initially spoke to Officer Celaya. There is no actual evidence – over and above after-the-fact supposition by Bilak and Detective Swanson from a video with no audio – that the unmasked robber ever said anything out loud during the robbery, much less that he also had an identifiable accent. Petitioner's argument – that he could not be the unmasked man because (a) the unmasked man had an Asian (actually Pacific Islander or Hawaiian) accent and (b) he does not – thus is based on flawed premises and therefore similarly flawed conclusions.[14]

Petitioner additionally maintains that testimony that Bilak and Johnny Hansen had not seen Garrow for six to eight months "wholly undermines their identifications and they cannot

---

[14]The Court further notes in passing that, notwithstanding petitioner's bald assertion in the federal reply, neither Garrow's ethnicity nor his accent or absence thereof appears to be an established fact of record in either state or federal court. A representation by the State in the trial record does suggest that Garrow had ties to Hawaii. (ECF No. 7-3, at 18; Exhibit 17, at 64.) The salient point, however, is that Johnny Hansen's preliminary hearing testimony about a Pacific Island or Hawaiian accent was in reference to one of the masked robbers, not the unmasked robber identified from the video by Bilak and the two Hansen brothers to be Garrow. Hansen was not even aware that there had been a fourth robber during the robbery or when he initially spoke to Officer Celaya. He became aware that there had been a fourth robber only later that evening when he saw the surveillance video with Detective Swanbeck, *after* Celaya had handed the investigation over to Swanbeck. (ECF No. 6-1, at 3-4; Exhibit 1, at 5-12. See also ECF No. 6-14, at 47-52; Exhibit 14, at 46-51.)

be taken seriously." (ECF No. 28, at 45.) This time period at best goes to the weight to be given to their testimony. This was not a situation where an out-of-court identification was made of a theretofore unknown individual who the witness had seen previously for only seconds or minutes with a gun in their face. Rather, Bilak and Hansen both were identifying an individual known to them with whom they had had prior business dealings over an extended period of time, for several years in the case of Hansen. (ECF No. 6-12, at 10-12 & 24; Exhibit 12, at 32-38 & 85. ECF No. 6-14, at 36-38; Exhibit 14, at 35-37.)

In all events, the state supreme court's holding on the prejudice prong was based upon the remaining evidence of guilt presented at trial, separate and apart from the identification evidence. The state supreme court's determination was not an objectively unreasonable application of *Strickland*.

Ground 4(b)(ii)(B) therefore does not provide a basis for federal habeas relief.[15]

---

[15]Petitioner further suggests that "[i]nterestingly, it turns out that there also was video of the front and rear exit and parking areas of [the Legacy Sports Card store] from a nearby store," but "[t]he police never bothered to investigate or obtain this video from the time of the robbery." (ECF No. 28, at 46.) Petitioner relies upon a statement in a purported December 8, 2010, letter from defense investigator John Alamshaw to defense counsel. (ECF No. 28-4; Exhibit D.) Once again, petitioner (a) relies upon material that does not appear to have been presented to the state courts and under *Pinholster* thus cannot be considered in reviewing the state court decision on the merits; (b) seeks to present operative factual allegations that were not set forth in the petition and, under *Cacoperdo*, therefore are not properly raised for the first time in the reply; and (c) misstates what the exhibit itself states. The exhibit states that "[a]pproximately 35 feet from where the robbery occurred is the Icon Salon/Spa," and the owner said "that she has video surveillance from the inside of her business as well as the rear exit/parking area and a portion of the front parking area." (ECF No. 28-4, at 1, ¶ 3.) The exhibit does not state that there "was video of the front and rear exit and parking areas *of LSC* from a nearby store." (Emphasis added.) The exhibit states only that the spa owner at one point had a video of "the" rear exit/parking area and a portion of the front parking area. That is, the exhibit does not state that the owner had video of parking areas specifically of the sports card store. In all events, even if this exhibit properly could be considered on federal habeas review, petitioner has the burden of proof on such review. Speculation about what a surveillance video from another business may – or may not – have shown seven years earlier does not carry the petitioner's burden of proof. Even if such unexplored evidence *arguendo* were interesting, it has no material significance on federal habeas review.

Garrow additionally contends in the reply that the state supreme court's determination that the district court did not err, during state post-conviction review, in denying his request for expert witness fees and failing to conduct a broader evidentiary hearing violated his right to due process and a fair trial. (ECF No. 28, at 49.) No such claim was presented in Ground 4(b) in the federal petition, and petitioner cannot raise the claim for the first time in the reply. *Cacoperdo, supra.* Moreover, claims of error in state post-conviction proceedings do not present cognizable claims on federal habeas review. *E.g., Franzen v.*

(continued...)

-33-

***Ground 4(c): Cross-Examination of Marcel Bilak***

In Ground 4(c), petitioner alleges initially that he was denied effective assistance of counsel when trial counsel failed to effectively cross-examine the witnesses against him. The only specifics that he alleges, however, concern the cross-examination of the store owner, Marcel Bilak.[16] He alleges that counsel failed to: (I) effectively cross-examine Bilak regarding the PayPal dispute; and (ii) show that there was no way for Bilak to adequately identify his stolen property. Petitioner asserts that "[t]his was further exacerbated by counsel's failure

_____

[15](...continued)
*Brinkman,* 877 F.3d 26 (9th Cir. 1989). Petitioner's additional claim that the state supreme court violated Nevada law when it denied him an evidentiary hearing is even further afield from a matter that may be reviewed herein.

In a related vein, petitioner urges, without additional argument or citation to authority, that "[h]e is at the very least entitled to an evidentiary hearing in this Court, and also funding to hire an expert and address this issue fully and fairly." (ECF No. 28, at 49, lines 12-13.) The state supreme court rejected the claim in Ground 4(b)(ii)(B)) on a basis that did not turn upon the content of the expert testimony sought and thus did not require an evidentiary hearing. Under *Pinholster,* review of the state supreme court's adjudication of the claim on the merits is limited to the record before that court. Given that the state supreme court's holding on that basis withstands review under AEDPA, an evidentiary hearing is not warranted on federal habeas review. Appointment of an expert witness therefore would not be warranted, even if indigence were established.

Garrow did not in fact establish indigence by competent evidence, however, in either state or federal court. Petitioner was represented by retained counsel both on state post-conviction review and in this federal proceeding. Petitioner attaches a copy of a purported *ex parte* application in the state district court to use public funds for an identification expert for state post-conviction review. (ECF No. 28-1; Exhibit A.) Retained counsel represented therein that petitioner's mother had paid for both counsel and an investigator but that she had no more funds for an expert witness. No supporting affidavits and financial materials establishing indigence appear to have been attached with the application. Nor does it appear that petitioner applied for and was granted pauper status in the state post-conviction proceeding. Indeed, the same retained counsel also represented petitioner on the state post-conviction appeal; and different retained counsel filed the federal petition and reply in this matter. Petitioner represented to this Court in proper person that he paid $10,000 to retain federal habeas counsel to file the federal petition – after the point that available funds allegedly had been exhausted in the state district court and further following a state court appeal. (ECF No. 10, at 2.) Petitioner – who is out of physical custody – thereafter has not sought pauper status in federal court; and he has not established by competent evidence his financial eligibility for, *inter alia,* expert assistance under 18 U.S.C. § 3006A. The federal reply closed the pleadings in this matter. A two-line request for appointment of an expert witness – by retained federal habeas counsel – embedded in a fifty-plus page reply without further argument and a demonstration of financial eligibility does not present a viable request for relief.

[16]As noted previously, habeas pleading is not notice pleading; and a petitioner must allege specific facts establishing a basis for federal habeas relief. *Mayle v. Felix, supra.*

to request a mistrial when Bilak blurted out that someone else told him that Mr. Garrow had done this before with his friends and that he knew how to do it." He continues that "[a]ll of this was exacerbated by defense counsel's failure to hire an expert to testify to the ownership and eyewitness suggestive identification issues." (ECF No. 1, at 12-13.)

The Supreme Court of Nevada did not discuss this claim separate and apart from its discussion of the closely related claims addressed previously herein. There is a strong presumption that a state court adjudicated a claim on the merits in an order where it expressly addressed some but not all of the petitioner's claims, and that presumption may be overcome only in unusual circumstances. *See Johnson v. Williams*, 568 U.S. 289, 298-302 (2013). In the present case, Garrow does not seek to rebut this presumption, conceding that "[t]he Nevada Supreme Court denied this claim on appeal without specific findings." (ECF No. 28, at 50.

The deferential standard of review under AEDPA remains applicable where the last reasoned state court decision rejects a claim on the merits without further discussion:

> A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). . . . .
>
> . . . . Under § 2254(d), a habeas court must determine what arguments or theories supported *or, as here, could have supported*, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court. . . . .
>
> . . . . .
>
> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through

-35-

appeal. *Jackson v. Virginia*, 443 U.S. 307, 332, n. 5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)(Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Richter*, 562 U.S. at 101-03 (emphasis added).

Garrow's claims in Ground 4(c) to a large extent substantially overlap his related claims in Grounds 4(a), 4(b)(I) and 4(b)(ii)(B).

First, petitioner's claim that counsel failed to effectively cross-examine Bilak regarding the PayPal dispute substantially overlaps his claim in Ground 4(a) that counsel was ineffective because, *inter alia*, his cross-examination opened the door to the details of the PayPal dispute and allowed Bilak to characterize the prior dispute as involving fraud by Garrow.

The state supreme court's implicit rejection of this aspect of Ground 4(c) was neither contrary to nor an unreasonable application of *Strickland* for substantially the same reasons discussed above regarding the related claim in Ground 4(a). On the required doubly deferential review, there was a reasonable argument that counsel satisfied *Strickland's* performance standard by pursuing a strategy on cross of seeking to establish that Garrow had no motive for the robbery because the prior dispute had been resolved. (See text, *supra*, at 11-15.) That strategy ran a risk of opening the door to more testimony on redirect regarding the PayPal dispute, but the fact that that risk ultimately manifested itself does not make counsel's strategy unreasonable. In this regard, counsel's performance, and his cost-benefit assessment, must be gauged without the distorting effects of hindsight based upon whether a strategy did or did not fully achieve its desired objective. (See text, *supra*, at 15.) Once the door was opened, continuing the inquiry thereafter on recross further ran a risk that Bilak might refer to the prior dispute as involving fraud, but the fact that that risk ultimately manifested itself also does not compel a conclusion that counsel's strategic choice was unreasonable. (See text, *supra*, at 16.) Finally, it was not objectively unreasonable for the

-36-

state supreme court to conclude, as it did regarding Ground 4(a), that there was not a reasonable probability of a different outcome at trial if counsel had proceeded differently given the strong evidence of guilt. (See text, *supra*, at 16-17.)

Second, petitioner's claim that counsel failed to effectively cross-examine Bilak to show that he could not adequately identify the stolen property and that this failure was exacerbated by his failure to hire an inventory expert substantially overlaps his claim in Ground 4(b)(I) challenging counsel's failure to hire the expert.

The state supreme court's implicit rejection of this aspect of Ground 4(c) was neither contrary to nor an unreasonable application of *Strickland* for substantially the same reasons discussed above regarding the related claim in Ground 4(b)(I).

Petitioner posits that more effective cross-examination of Bilak together with an inventory expert would have established that: (a) there was no way to determine what was stolen from the store with its inventory methods; and (b) Bilak "verifiably lied to police when he described the property allegedly stolen from him." (ECF No. 28, at 49 & 51.) On the latter point, Garrow apparently is referring back to a July 1, 2009, voluntary statement where Bilak referred to cards from hobby boxes as having been stolen, in a circumstance where it was impossible to know which specific cards were in the hobby boxes until after they were opened, subsequent to being stolen. (See text, *supra*, at 30.)

The prior discussion of Ground 4(b)(I) establishes that the state supreme court's express rejection of a claim that counsel was ineffective for failing to call an inventory expert was an objectively reasonable application of the performance prong of the *Strickland* standard. The trial testimony identifying the items stolen in actual fact was more specific and supported than petitioner represents in his federal pleadings, and the expert testimony presented at the state evidentiary hearing did not substantially undercut that trial testimony in any significant respect. (See text, *supra*, at 18-21.)

With regard to cross-examination, the only specific point for cross that petitioner identifies in the entire reply with regard to inventory is Bilak's July 1, 2009, voluntary statement referring to additional cards also being in stolen hobby boxes. At the very outset,

petitioner has not established that this July 1, 2009, voluntary statement was before the state courts on state post-conviction review.[17] It thus does not appear that the statement is properly considered under *Pinholster* when reviewing the state courts' implicit rejection of Ground 4(c) on the merits. In any event, as the prior discussion of this particular statement reflects, it is entirely speculative that cross-examining Bilak about the statement would have materially aided the defense at trial. The single sentence in the short statement relied upon by Garrow as easily could have constituted simply a reference to the fact that additional cards were stolen that were contained in hobby boxes – rather than a statement purporting to identify cards recovered in the search as coming from stolen hobby boxes. (See text, *supra*, at 30.) The state supreme court thus readily could have concluded – if this statement was in the record before that court in the first instance – that petitioner could not demonstrate a reasonable probability that cross-examining Bilak regarding the statement would have led to a different outcome at trial.

Petitioner otherwise does not identify what specific additional cross-examination defense counsel should have pursued that would have established that Bilak had no way of knowing what cards were stolen in the robbery. Again, the trial testimony identifying the items stolen in actual fact was more specific and supported than petitioner represents in his federal pleadings, and the expert testimony presented at the state evidentiary hearing did not substantially undercut that trial testimony in any significant respect. (See text, *supra*, at 18-21.) Moreover, defense counsel did cross-examine Bilak at considerable length seeking to undermine his testimony as to the store's ownership of the cards recovered in the two searches. (ECF No. 6-12, at 23-26 & 27-28; Exhibit 12, at 83-85, 88-96 & 100-03. See also ECF No. 6-14, at 57-61 & 64-65; Exhibit 14, at 56-60 & 63-64.) Based on the record

---

[17]As discussed regarding other claims, petitioner presented a number of exhibits with the federal reply that were not referenced in the federal petition. A number of the exhibits (such as a recent photograph of petitioner) clearly could not have been in the record before the state courts on post-conviction review. Petitioner otherwise did not seek to establish that the exhibits were included in that record, essentially disregarding the holding of *Pinholster* concerning the evidence that may be considered on claims reviewed pursuant to AEDPA.

presented to the state courts, an implicit determination by the state supreme court that petitioner had demonstrated neither deficient performance nor resulting prejudice from a failure to cross-examine Bilak further regarding ownership of the cards was neither contrary to nor an objectively unreasonable application of the general standards in *Strickland*.

Third, petitioner's claim in Ground 4(c) that he was denied effective assistance of counsel due to counsel's failure to hire an identification expert fully overlaps his claim in Ground 4(b)(ii)(B) to the same effect. The state supreme court's rejection of the claim was neither contrary to nor an unreasonable application of *Strickland* for the same reasons discussed as to Ground 4(b)(ii)(B). (See text, *supra*, at 25-33.)

The only portion of Ground 4(c) that remains for discussion is petitioner's allegation that the other alleged failures were "further exacerbated by counsel's failure to request a mistrial when Bilak blurted out that someone else told him that Mr. Garrow had done this before with his friends and that he knew how to do it."

On direct, Marcel Bilak testified that, on the same day that Garrow allegedly called the store masquerading as Johnny Hansen's purported cousin, he received a call from competing store owner Jeremy Brown. According to Bilak's testimony, Brown told Bilak that Garrow had been calling Brown for the last month and telling him that he was going to rob Bilak's store. Bilak then continued that Brown said to him:

> He keeps threatening that he is going to rob your store, that him and his friends have done this before. They know how to do it and . . . .

(ECF No. 6-12, at 13; Exhibit 12, at 43-44.) Defense counsel objected before Bilak could complete the sentence. Following a bench conference, the trial judge sustained the objection and instructed the jury "to disregard the last portion of the statement that Mr. Brown allegedly made to Mr. Bilak about Mr. Garrow and his friends doing something like this before." (*Id.*)

In federal court, petitioner again presents evidence that was not before the state courts when the corresponding claim was rejected on the merits. Petitioner has submitted a sworn declaration by co-counsel for the State executed on May 16, 2016, a year-and-a-half after the filing of the federal petition. (ECF No. 22.) This declaration obviously was not before the

state courts during state post-conviction review. Under *Pinholster*, the declaration cannot be considered in reviewing the state court decision under AEDPA.

An implicit determination by the state supreme court that petitioner could not demonstrate prejudice from a failure to request a mistrial was neither contrary to nor an unreasonable application of *Strickland*. Petitioner, who has the burden of persuasion on post-conviction review, has not cited any federal constitutional or Nevada state law authority requiring a mistrial in the circumstances presented rather than the admonition instead given by the trial judge to the jury. A conclusion that there was not a reasonable probability of a different outcome if counsel had requested a mistrial was not an objectively unreasonable application of the general prejudice standard in *Strickland.*

Ground 4(c) accordingly does not provide a basis for federal habeas relief.

**IT THEREFORE IS ORDERED** that the petition is DENIED on the merits and that the petition shall be DISMISSED with prejudice.

**IT FURTHER IS ORDERED** that a certificate of appealability is DENIED. Under the standards set forth in *Slack v. McDaniel*, 529 U.S. 473 (2000), jurists of reason would not find debatable or wrong either the prior unopposed dismissal of multiple claims for lack of exhaustion or the rejection of the remaining claims on the merits, for the reasons discussed herein.[18]

The Clerk shall enter final judgment accordingly, in favor of respondents and against petitioner, dismissing this action with prejudice and closing this case.

---

[18]With regard to any counsel issues in subsequent proceedings, the Court notes that petitioner was represented by retained counsel herein through the filing of the reply. After that point, the Court granted counsel's motion to withdraw following upon her representation that payment had been stopped on a payment previously made and no further payments had been made. (ECF No. 33 & 35.) Petitioner, who is out of physical custody, at no time has established for the record that he is financially eligible for the appointment of counsel, if same otherwise were warranted under 18 U.S.C. § 3006A(a)(2)(B). Retained counsel withdrew after the pleadings were closed and the matter was postured for a final decision, following the filing of an extensive reply.

-40-

DATED: September 6, 2018.

_____
RICHARD F. BOULWARE, II
United States District Judge